Bobby RUSSELL *v.* STATE of Arkansas

CA CR 03–402                                                157 S.W.3d 561

Court of Appeals of Arkansas
Divisions II and III
Substituted Opinion upon Grant of Rehearing
delivered April 7, 2004*

---

*The original opinion, delivered January 28, 2004, was not published.

*Mike Everett*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Clayton K. Hodges*, Ass't Att'y Gen., for appellee.

JOHN F. STROUD, JR., Chief Judge. This is a substituted opinion upon grant of appellant's motion for rehearing. In an unpublished opinion, *Russell v. State*, CACR03-402 (January 28, 2004), this case was dismissed on appeal for failure to strictly adhere to Rule 24.3 of the Arkansas Rules of Criminal Procedure, which sets forth the requirements for filing a conditional plea of guilty. Specifically, this court held that there was no indication that the trial court had approved the conditional plea. Furthermore, we also held that the judgment and commitment order did not indicate that the plea was conditional; it only indicated that appellant had "voluntarily, intelligently, and knowingly entered a negotiated plea of guilty."

In his petition for rehearing, appellant's attorney referred to a document entitled "Order of Probation or Suspending Imposition of Sentence, or Judgment and Commitment." We thereby learned for the first time of the existence of this document, because although it was included in the record, it was not abstracted. The last page of this document, which was attached to the Petition for

Rehearing, was entitled, "Special Conditions," under which was made the following notation: "Defendant's plea is conditioned on the results of an appeal of the court's decision denying defendant's Motion to Suppress Evidence, dated July 8, 2002." This page is signed by the trial judge. Although this document was not attached to the other judgment and commitment order and was filed as a separate document, the filemark shows that both documents were filed the same day, September 5, 2002, at the same time, 11 a.m.

■ Upon reconsideration on grant of rehearing, we hold that we are able to go to the record to look at a document that was not abstracted in order to determine if we have jurisdiction to hear the appeal. The record on appeal is limited to that which is abstracted; although the appellate courts will not examine the transcript of a trial to reverse a trial court, they may do so to affirm. *Bridges v. State*, 327 Ark. 392, 938 S.W.2d 561 (1997). In this case, we hold that reviewing the record to determine if jurisdiction is conferred upon this court to hear this case is *affirming* the trial court's preservation of appellant's right to appeal by entering a conditional plea of guilty. We hold that the issue in this case is analogous to the one we addressed in *McCormick v. State*, 74 Ark. App. 349, 48 S.W.3d 549 (2001) (substituted opinion on grant of rehearing), in which we held that the prosecutor's assent to the conditional plea was manifested by his presence in the courtroom and his acquiescence to the entry of the negotiated plea agreement.

Before we can determine that we have jurisdiction to hear this case, we must also address one of the issues presented in *Barnett v. State*, 336 Ark. 165, 984 S.W.2d 444 (1999), in which our supreme court held that it was "significant" that the judgment and commitment orders made no reference to the appellant's guilty plea being a conditional plea, that the orders indicated that the appellant had "voluntarily, intelligently, and knowingly entered a negotiated plea of guilty," and that those orders were inconsistent with an assertion that such a plea was conditional.

■ In the present case, the judgment and commitment order found in the addendum only indicates that Russell "voluntarily, intelligently, and knowingly entered a negotiated plea of guilty," which would appear to be contrary to *Barnett*. However, that judgment and commitment order found in the addendum and the unabstracted document signed by the trial judge entitled "Order of Probation or Suspending Imposition of Sentence, or Judgment and Commitment," *which were filed together on the same*

*date and at the same time,* when read together, demonstrate that the trial court did indeed approve of the entry of the conditional plea. Therefore, on rehearing we hold that jurisdiction has been established in this court to hear the merits of this appeal.

In light of the determination that we have jurisdiction to hear this case on its merits, we now turn to the facts of the case. Appellant, Bobby Russell, entered a conditional plea of guilty pursuant to Rule 24.3(b) of the Arkansas Rules of Criminal Procedure to the offense of criminal attempt to manufacture a controlled substance, methamphetamine. His sole issue on appeal is that the trial court erred in denying his motion to suppress evidence found in what he contends was an illegal search.

When reviewing a trial court's denial of a motion to suppress, the appellate court conducts "a *de novo* review based on the totality of the circumstances, reviewing findings of historical facts for clear error and determining whether those facts give rise to reasonable suspicion or probable cause, giving due weight to inferences drawn by the trial court." *Saulsberry v. State*, 81 Ark. App. 419, 423, 102 S.W.3d 907, 910 (2003) (citing *Davis v. State*, 351 Ark. 406, 94 S.W.3d 892 (2003)).

In the present case, Robb Rounsavall of the Mississippi County Sheriff's Department testified at the suppression hearing that he received information on December 19, 2001, that Scott Russell had a tank of anhydrous ammonia hidden in a ditch behind his residence and his brother Bobby's trailer. When he acquired the information, Rounsavall and Deputy Bobby Ephlin went out to the area to search it with a four-wheeler. Rounsavall said that the residences were at the end of a paved, dead-end county road in a rural area of the county. He said that the road turned to dirt past the residences and that he and Deputy Ephlin drove past the residences to a field road, where Deputy Ephlin left on the four-wheeler to search the field.

Rounsavall said that he saw Bobby and his wife come out of the trailer and that his wife left. He said that he had known Bobby for eight or nine years; that Bobby had been employed by the sheriff's office for a couple of years previously; that Bobby was just standing in the yard; and that he just pulled the truck up in front of the trailer on the road and started talking to him. He told Bobby that they had information about Scott having a tank of anhydrous ammonia hidden in the ditch and that Deputy Ephlin was on the four-wheeler looking in the ditch. Rounsavall testified that he and

Bobby were standing outside the truck talking when Scott, who was sweating, came out from behind the trailer, which surprised him. Rounsavall asked Scott what he was doing; Scott told him that he was "working on some things." When asked what kind of things, Scott did not have an answer. Rounsavall said that he was suspicious and asked Scott if he would show him what he was working on, to which Scott responded, "Please don't arrest me."

Rounsavall said that he had walked to the corner of the trailer, about three to five steps, and could see down the side of the trailer. He said that from that vantage point, he could see a red Liquid Fire bottle standing upright in front of the shed with a plastic tube coming out of the top of the bottle. He said that this was observable from the county road. He said that a plastic container could also be seen through the doorway of the shed that contained a clear liquid with a bluish tint, and he also saw a box of salt and another Liquid Fire bottle. At that time Rounsavall said that he thought he was seeing part of a methamphetamine lab, and he asked Scott if he had a meth lab in the shed, to which Scott replied, "Please don't arrest me, it's Christmas." Rounsavall told Bobby that there were meth lab components on his back porch and in the shed, and Bobby told him that he knew nothing about any of it. Prior to receiving written consent to search, Deputy Ephlin returned on the four-wheeler and informed Rounsavall that he observed a large plastic container containing a liquid substance on the bow of a boat behind the residence, but Rounsavall did not know how close Ephlin had come to the house.

Rounsavall testified that he then received written consent from both Bobby and Scott before he walked to the shed, where he found the components of a meth lab, including the tank of anhydrous ammonia. He said that it took maybe ten minutes before the consent-to-search form was signed; he did not remember if Deputy Ephlin had the form or if other officers he contacted brought the consent form to him. He also later testified that they had to wait anywhere from fifteen to thirty minutes for the consent forms to be brought to the residence. He then acknowledged that he might have been at the residence for more than two hours before the consent forms arrived. However, he was adamant that he did not walk to the shed until after the consent forms were signed.

It is unclear exactly when Scott was arrested and informed of his Miranda rights. Rounsavall first said that the consent forms were completed, the shed was searched, and then Scott was

arrested. Then he testified that Scott was arrested after he said that it was "all his stuff" while they were talking about what Rounsavall had seen from the road, and then the consent forms were signed.

Deputy Ephlin testified that he went with Rounsavall on December 19 to assist in the search for the anhydrous ammonia tank that had supposedly been left in a ditch behind the Russell property. He said that as he was in the field searching, he found numerous Coleman fuel cans, some muriatic acid bottles, and some plastic containers. Ephlin testified that when he returned to where Rounsavall was in front of the trailer, a few feet off the road, Rounsavall told him to "look around the corner of the trailer." He said that he could see a Liquid Fire bottle with a hose stuck in it and some Tupperware containers, and that there was a box of salt on the porch. Ephlin said that he could see the items on the porch more clearly than the items in the shed. He said that it took between thirty minutes to an hour for officers to arrive with a consent form; he witnessed Bobby's and Scott's signatures on the consent form, but he could not remember if the consent form was signed before or after the Miranda rights form. He did say that Rounsavall had accompanied Bobby into the residence at some point in time, but he could not remember whether that was before or after the consent form arrived.

Bobby testified that he had previously been a police officer for about two and one-half years. He denied that any of the items the officers testified about could be seen from the road, stating that ladders and a fence row would have blocked the view. He said that he and Rounsavall walked back to the shed, and he denied that Rounsavall ever asked for consent. Bobby said that all of the officers had gone back to the shed before any consent to search was given. He said that when he signed the consent to search, he knew that he was giving consent to search his residence, and that was his intention; he said that to his understanding, the officers had already searched his residence before he even gave consent. Bobby said that he signed the consent to search because it was his understanding that he was not going to be charged with anything.

Billy Russell, Bobby's and Scott's father, testified that Rounsavall told him twice that they were not going to arrest Bobby, but that they had arrested Scott for drugs.

Scott testified that Rounsavall started walking back to the shed on his own, and that he and Rounsavall walked to the porch. When Rounsavall asked if there was a meth lab, Scott said that he

told him that it was his. He said that before he signed a consent form, Rounsavall had walked to the shed twice, and Ephlin had also walked to the shed. He said that the officers told him that if he did not sign the consent form they were going to arrest Bobby, and he agreed to take the blame for it. He said that he believed that if he signed the consent form that Bobby would not be arrested, and that he did not sign the consent form until the officers had found everything.

On appeal, Bobby argues that the trial court erred in denying his motion to suppress the evidence found at his home because it was the product of an illegal search. He states that the trial judge found as a matter of fact that all of the contraband had been discovered before the consent was signed and that before consent was signed both officers had been to the back of the house. However, our inspection of the trial judge's order establishes that these statements were in the order as part of the summary of Scott's testimony. While it is true that Scott testified in this manner, these are not findings of fact by the trial court, as contended by the appellant.

Appellant, citing *Holmes v. State*, 347 Ark. 530, 65 S.W.3d 860 (2002), argues that a consent signed after the intrusion into a person's home does not validate a warrantless search. There is no question that consent was freely given, as appellant testified that he understood what he was doing when he signed the consent and that he intended to sign it. However, if the testimony of the officers is believed, the items initially seen by the officers were outside the shed and porch of the mobile home. An expectation of privacy in driveways and walkways, which are commonly used by visitors to approach dwellings, is not generally considered reasonable. *Gaylord v. State*, 1 Ark. App. 106, 613 S.W.2d 409 (1981). Furthermore, there was conflicting evidence regarding when the search took place. The officers testified that once they saw the Liquid Fire bottles and salt from the road, they called for a consent form and did not go back to the shed until the consent form was signed. Appellant's and his brother's testimony was in direct conflict with the officers' testimony. However, credibility determinations and conflicts in testimony are for the trial court to resolve. *Jones v. State*, 344 Ark. 682, 42 S.W.3d 536 (2001). In this case, the trial judge clearly believed the officers' testimony.

We hold that the trial court properly denied the Motion to Suppress, and appellant's conviction is therefore affirmed.

Affirmed.

HART, GLADWIN, ROBBINS, BAKER, and ROAF, JJ., agree.